[No. 29559. Department One. November 1, 1945.]

EDGAR L. HASTINGS, *Respondent*, v. THE DEPARTMENT OF
LABOR AND INDUSTRIES, *Defendant*, E. C. MILLER CEDAR
LUMBER COMPANY, *Appellant*.[1]

[1]Reported in 163 P. (2d) 142.

2

*L. B. Donley,* for appellant.

*Griffin & Gershon* and *Russell F. Stark,* for respondent.

STEINERT, J.—This action arose out of a workman's claim for compensation, under the industrial insurance act. The cause reached the superior court upon the record made before the joint board of the department of labor and industries. Both the department and the employer of the workman resisted the claim. The cause was tried to a jury, which returned a verdict, based upon its answers to certain interrogatories, favorable to the workman. From a judgment on the verdict, the employer alone appealed. The workman will hereinafter be referred to as respondent, and the employer, E. C. Miller Cedar Lumber Company, a corporation, as appellant.

On May 19, 1941, respondent, while engaged in extrahazardous employment in appellant's sawmill, sustained an injury to his right forearm. In his report of the accident, he described it in this manner: "I slipped and threw my right arm into the belt which was running the hog [a fuel-grinding machine]." The appellant employer's report described it similarly, thus: "Slipped—got arm caught in belt operating hog. Fracture right radius." The attending physician, who treated the appellant on the day of the accident, in his report described the external evidence of injury as "Right forearm marked swelling and tenderness—Crepitation over the radius at the junction at lower end with the middle third." The physician also reported his X-ray findings as follows:

"X-ray of the right arm reveals a fracture of the lower end of the radius about 4″ above the wrist joint. There is marked palmar bowing at the site of the fracture and the ends of the fractured fragments are in contract [sic] over two-thirds of the width of the shaft. Recheck in a. p. view shows excellent alignment. There is apparently an anatomical variation in the tip of the styloid process of the ulna a supernumerary bone."

The treatment given the patient consisted of a reduction of the fracture and the application of anterior and posterior

splints of plaster of Paris. The physician estimated the time loss from work at three months.

Respondent filed a claim for compensation and, by an order of the department entered September 6, 1941, was allowed time loss to August 10, 1941. Shortly thereafter, respondent made an informal application for the reopening of his claim, on account of alleged aggravation. The department referred the matter to a physician who suggested that the rating be deferred thirty days. On December 31, 1941, the supervisor of the department, adopting the recommendation of its physician, closed the claim upon a permanent partial disability allowance of one tenth of what is termed the "amputation value" of the arm detruncated at the wrist, resulting in an award of one hundred ninety-two dollars.

After the claim had been thus closed, and during a period of about twenty months thereafter, respondent worked successively for two companies manufacturing wood products. During that period he claims to have suffered extreme numbness in his arm, particularly at night after a hard day's work. This numbness extended from his wrist to his shoulder and on both the outside and the inside of his arm.

On September 13, 1943, respondent filed a written application for the reopening of his claim, on the ground of aggravation, alleging that his "arm gets numb on working hard, more pain and stiffness." The matter was again referred by the department to its physician, who subsequently examined the respondent and thereafter made a report to the effect that there was no aggravation of respondent's condition. The supervisor thereupon rejected the application for reopening. The respondent then applied for and was granted a rehearing before the joint board. At the rehearing, evidence was taken, constituting the departmental record. That evidence will be later referred to in more detail. At the conclusion of the rehearing, the joint board sustained the action of the supervisor rejecting respondent's claim for aggravation. Respondent then appealed to the superior court for Grays Harbor county, where the cause was tried before a jury, resulting in a verdict in respondent's favor.

Upon entry of judgment on the verdict, the employer appealed to this court.

Appellant's assignments of error present two questions: (1) whether respondent's evidence was competent and sufficient to make a case for the jury; and (2) whether the trial court erred in giving certain instructions. In considering these questions, we proceed upon three well-established rules.

The first rule is that the decision of the department is *prima facie* correct and the burden of proof is upon the party attacking the decision. Rem. Rev. Stat., § 7697 (now appearing as Rem. Supp. 1943, § 7697 [P. P. C. § 704-1]); *Zankich v. Department of Labor & Industries,* 189 Wash. 25, 63 P. (2d) 427; *Nagel v. Department of Labor & Industries,* 189 Wash. 631, 66 P. (2d) 318; *Cole v. Department of Labor & Industries,* 200 Wash. 296, 93 P. (2d) 413; *Reid v. Department of Labor & Industries,* 1 Wn. (2d) 430, 96 P. (2d) 492; *Eyer v. Department of Labor & Industries,* 1 Wn. (2d) 553, 96 P. (2d) 1115; *LaLone v. Department of Labor & Industries,* 3 Wn. (2d) 191, 100 P. (2d) 26.

The second rule is that there can be no proper award for "aggravation" of a permanent partial disability, under Rem. Rev. Stat., § 7679 (now appearing as Rem. Supp. 1941, § 7679 [P. P. C. § 705-1]), unless it is shown that an increase of disability occurred after the date of the last closing of the claim. *Smith v. Department of Labor & Industries,* 180 Wash. 84, 38 P. (2d) 1016; *Reid v. Department of Labor & Industries, supra; LaLone v. Department of Labor & Industries, supra; State ex rel. Stone v. Olinger,* 6 Wn. (2d) 643, 108 P. (2d) 630; *Brown v. Department of Labor & Industries,* 23 Wn. (2d) 572, 161 P. (2d) 533.

The third rule is that where a case arising out of the industrial insurance act is tried before a jury, the weight of the evidence and the credibility of the witnesses are for the jury to determine. *Alfredson v. Department of Labor & Industries,* 5 Wn. (2d) 648, 105 P. (2d) 37; *Bilski v. Department of Labor & Industries,* 8 Wn. (2d) 594, 113 P. (2d) 62; *Otter v. Department of Labor & Industries,* 11 Wn. (2d) 51, 118 P. (2d) 413; *Roellich v. Department of Labor & In-*

*dustries,* 20 Wn. (2d) 674, 148 P. (2d) 957.

In the *Alfredson* case, *supra,* the rule is expressed in the following language:

"The presumption of the correctness of the joint board's findings is for the consideration of the jury under proper instructions. The court, of course, may pass upon the sufficiency of the evidence to take the case to the jury. If the evidence introduced at the hearing before the joint board offers room for a difference of opinion in the minds of reasonable men, then the case must be presented to the jury."

Further on, in the opinion, the court said:

"It is true that the testimony of many well qualified physicians upheld the decision of the joint board. However, in cases tried to a jury, the jury determines the weight of the evidence, secured from a consideration of all of the evidence introduced, and its verdict does not depend upon the number of witnesses that may testify upon a given point."

It is conceded by the respondent in this case that the department and the appellant herein produced evidence through medical testimony which would support the action taken by the joint board. We may also concede that such evidence was sufficient to support a verdict by the jury in favor of the appellant, had the jury so found. The question here, however, is whether the evidence produced by the respondent was competent and sufficient to take the case to the jury and to support its verdict in his favor. The answer to that question depends entirely upon the competency and probative effect of the testimony of Dr. Joseph Segal, called as a witness for the respondent. Since the factual aspect of the case hinges so largely upon his testimony, we shall quote it at some length.

The doctor first testified concerning the history of the case as given to him by the respondent:

"Q. Now, Doctor, at that time did he relate to you a history of his injury that occurred May 19th, 1941, and of his treatment and work record thereafter? A. Yes, sir. Q. Doctor, Did he tell you that his claim was closed in—on December 27th, 1941? A. Yes, sir. Q. And did he tell you that he applied to reopen for aggravation on September 15th, 1943? A. Yes, sir. Q. Did he tell you why he applied to

reopen, Doctor? A. Well, as I recall it, he said when he worked, of course he had symptoms of—symptoms were aggravated, both in his hands, wrists and lower arm, and, in fact, up to his shoulder, the right shoulder. Q. Did he give— A. He said his condition was aggravated. It was worse than when it was the time the case was closed. Q. Did he tell you what developed between the closing, especially— did he tell you what symptoms developed or what trouble developed in his arm? A. Well, I believe he referred to a numbness that he had in it, in his hand, his wrist, lower arm and upper arm. Q. And, Doctor, what were all of his complaints when you examined him? A. Well, as I recall it, he wore a leather strap. He thought it might support his wrist. He said he had a general weakness of the wrist and of his hand. In fact, his grip was poor. I am just repeating the words he gave me; and when he worked, he was unable to do the work he could formerly, before the injury; not only did it bother his wrist and hand, but it also bothered his entire arm with numbness and fatigues."

The doctor then testified as follows concerning the examination which he made of the respondent on November 30, 1943, a short time prior to the rehearing before the joint board:

"Q. And, Doctor, you examined him with reference to those complaints, did you? A. Yes, sir. Q. You took an x-ray picture? A. Yes, sir. [An X-ray picture taken by the doctor showing respondent's wrist and a part of his forearm was then identified by the witness and was offered and admitted without objection.]"

With the X-ray picture before him, the doctor then testified concerning respondent's condition, as follows:

"Q. Doctor, what does . . . the x-ray picture that you took on November 30th, 1943, show? A. Perhaps I could best show it on the shadow box. Q. Sure. A. I will just do that because this shows more clearly, although this is an antique x-ray machine. Anyway, the ulna here shows a styloid process, which ordinarily someone would think it had been fractured; but that is not the case. It shows no fusion took place of the epiphysis. . . . The man is 53 years old. This should be fused, but it isn't. Q. The styloid process is the little lump that appears on the outside of everybody's wrist? A. Yes. There is no fusion there. Anyway, at the lower end of the radius here it shows a

roughening there. That is why I wanted to see the original picture [the one taken by the department]. It looked like it might have been the—the periosteum or the cartilage or some of the bone may have been cracked. I don't know. I can't tell from this. There is a roughening there; but there is an injury in the wrist joint. That is what I am trying to say. Anyone can see that if I point it out to you. It is not smooth as it should be, and as we go up the radius aways— Q. Doctor, the radius is the big bone in the forearm? A. That is right. Q. Is that right? A. As we go up the radius, we see the new bone formations due to an old fracture; and this bone here is angulated. There is quite an angle here that you can see, yourself, which, of course, distorts the tissues in the forearm, the soft tissues, such as the tendons, the muscles and that sort of thing. Q. Doctor, how do you account for the claimant's complaint of—the patient's complaint of numbness in his arm? A. Well, that is explained by the fact that the anatomical structures have been changed over a period of about almost three years, isn't it? It was two or three years, two or three years of injury there, and because of the anatomical changes that have taken place, it naturally throws his musculature off balance. Therefore, when he uses his hand and wrist and that sort of thing, he is bound to have pain because of the nerve structures that run from the brachial plexus down the arm have also been injured to the extent that the new adhesions are formed, that is, the covering of the nerve tissue, and anytime he exerts this part, it will produce more pain or numbness, as the case may be. . . . Q. And, Dr. Segal, from the history related to you and from your complete examination, including the review of the x-rays, what is your opinion, Doctor, on the issue of aggravation in this case between the date of closing, December 27th, 1941, and the date that the claimant applied to reopen his claim on September 15th, 1943? What is your opinion? A. You mean— Q. What is your opinion as to whether there was an aggravation between those two dates? A. *I am simply taking the patient's word for it. I have no reason to doubt his word.* Q. If you do take his word for it, what is your opinion? A. Why, I can see where it could be aggravated, yes. Q. And is that your opinion, that what he told you is true? A. Oh, yes, definitely. Q. Doctor, do you feel that he has suffered a permanent partial disability as a result of the accident? A. Absolutely. Q. How much, in your opinion, should this disability be rated? A. I think this injury, from what I saw

of the man, from what I see from the x-ray pictures,—I think it should be rated from the shoulder down. Q. What percentage of disability do you feel he suffered? A. At least 50%. Q. That would then be 50%— A. I don't see wherein surgery would help him or even medical treatment, not now. It is about three years, I think. Q. That would be 50% of the amputation value of the arm at the shoulder? A. Yes, sir." (Italics ours.)

On cross-examination, the witness testified further:

"Q. You have, Doctor, the—the objective things that you find there which you attribute to the accident consist of the fracture in the radius, is that not correct? A. Yes, mainly. Q. And you have, have you not, off the record here, examined Department x-rays showing the x-rays taken at about the time the claim was closed? A. Yes. Q. They show the same condition of the bone? A. No, as a matter of fact, showed more roughening. Actually, it showed more roughening. Q. Shows more roughening now? A. More roughening now in the wrist joint. I can show it to you, even to a lay person. Q. You now contend there is more of a roughening in what part? A. Right wrist, in the right wrist joint."

From this testimony, several things are apparent. First, the doctor obtained from the respondent a history of the injury and a recitation of his complaints of suffering. This was the normal and proper course of procedure. He then examined the patient with reference to those complaints, took an X-ray photograph of the injured member, and learned therefrom that the anatomical structures of the arm had been changed over a period of several years since the accident. The effect of these changes was to throw the musculature "off balance," with the result, as testified by the witness, that when the respondent used his hand, he was bound to have pain because of the nerve structures.

Appellant contends that this case falls within the rule laid down in *Cooper v. Department of Labor & Industries*, 20 Wn. (2d) 429, 147 P. (2d) 522, and *Roellich v. Department of Labor & Industries*, 20 Wn. (2d) 674, 148 P. (2d) 957. That contention is based wholly, and emphatically, upon that portion of the doctor's testimony wherein he was asked to give an opinion as to whether there had been an aggrava-

tion and, in answer thereto, stated: "I am simply taking the patient's word for it. I have no reason to doubt his word."

It is apparent to us, and we believe the jury clearly understood, that what the doctor meant by that particular statement was that he accepted as true the respondent's recitation of his physical complaints. It is true that those complaints in themselves constituted merely subjective symptoms; but the doctor was entitled and required to consider them in making his examination. The distinction between this case and the *Cooper* case, *supra*, is that in the cited case there was no evidence of a single objective symptom. Commenting on the testimony given by the supporting physician, the opinion says:

"That physician, *solely* on the basis of the statements of respondent [the injured claimant] respecting the pains he was undergoing, and that he was 'worse than he was when the claim was closed' in 1938, gave as his opinion that respondent's condition since the claim was closed had become aggravated." (Italics ours.)

In the case at bar, the physician did not rely solely on the statements of the respondent respecting his pains, but made a physical examination and took an X-ray picture, from which he found a condition logically explanatory of the cause of respondent's increased suffering and disability.

The *Roellich* case, *supra*, is for the same reason distinguishable from the case at bar.

In our opinion, the testimony of Dr. Segal was competent and constituted sufficient evidence to take the case to the jury.

Under the provisions of Rem. Rev. Stat. (Sup.), § 7697-2 [P. P. C. § 704-1], the verdict of the jury in workmen's compensation cases has the same force and effect as in actions at law. Where the evidence is in dispute, but at the same time there is substantial evidence to support the verdict of the jury, the verdict is controlling as to the disputed issues of fact. *Darling v. Department of Labor & Industries,* 6 Wn. (2d) 651, 108 P. (2d) 1034; *Calkins v. Department of Labor & Industries,* 10 Wn. (2d) 565, 117 P. (2d)

640; *Otter v. Department of Labor & Industries, supra;*
*Cooper v. Department of Labor & Industries,* 11 Wn. (2d)
248, 118 P. (2d) 942; *Husa v. Department of Labor & Indus-*
*tries,* 20 Wn. (2d) 114, 146 P. (2d) 191; *Omeitt v. Depart-*
*ment of Labor & Industries,* 21 Wn. (2d) 684, 152 P. (2d)
973; *Peterson v. Department of Labor & Industries,* 22 Wn.
(2d) 647, 157 P. (2d) 298.

Under these considerations we conclude that appellant's
first assignment of error is not well taken.

▋ The second question here involved relates to three
instructions given to the jury by the trial court. The first
of these instructions defined the term "permanent partial
disability" in the words of Rem. Rev. Stat., § 7679 (now ap-
pearing as Rem. Supp. 1941, § 7679). Appellant contends
that inasmuch as respondent's present claim did not involve
permanent partial disability, as such, but only an increase
of such disability, the instruction was unnecessary, super-
fluous, confusing, and erroneous. We do not agree with this
contention. The instruction may have been unnecessary,
but since the term "permanent partial disability" has a tech-
nical, statutory meaning, and since the term was repeatedly
used throughout the testimony, and since the question which
was submitted to the jury related to the increase, if any, of
such disability, the court had the right to define the term in
the words of the statute. The instruction cannot be said to
be confusing, and certainly the appellant was not prejudiced
thereby.

▋ Appellant next complains of an instruction relating
to the right of a workman to recover for an injury which
lights up or makes active a latent or quiescent infirmity or
weakened physical condition, whether such condition be
congenital or developmental. The contention is that no ele-
ment of lighting up a quiescent or latent infirmity is present
in this case, and that the instruction was therefore preju-
dicial. We agree that the instruction, though it may have
been correct in form, was inapplicable to the issue here in-
volved, and should not have been given, but we are unable
to say that it was prejudicial.

Appellant finally complains of an instruction given by the trial court, reading as follows:

"You are instructed that the Workmen's Compensation Act of the State of Washington should be liberally applied in favor of its beneficiaries, the injured workmen. It is a humane law and founded on sound public policy and is the result of lawful, painstaking and humane considerations, and its beneficent provisions should not be limited or curtailed by narrow construction."

It has been repeatedly stated by this court that the workmen's compensation act is highly remedial in character and, as such, is to be liberally construed with a view to the accomplishment of its beneficent purposes. *State ex rel. Crabb v. Olinger,* 196 Wash. 308, 82 P. (2d) 865; *Campbell v. Department of Labor & Industries,* 2 Wn. (2d) 173, 97 P. (2d) 642; *Nelson v. Department of Labor & Industries,* 9 Wn. (2d) 621, 115 P. (2d) 1014; *Berry v. Department of Labor & Industries,* 11 Wn. (2d) 154, 118 P. (2d) 785, 140 A. L. R. 392.

In this connection, however, this court has also frequently said that, while the act should be liberally construed in favor of those who come within its terms, yet persons who claim rights thereunder should be held to strict proof of their right to receive benefits provided by the act. *Kirk v. Department of Labor & Industries,* 192 Wash. 671, 74 P. (2d) 227; *Clausen v. Department of Labor & Industries,* 15 Wn. (2d) 62, 129 P. (2d) 777; *In re Jullin,* 23 Wn. (2d) 1, 158 P. (2d) 319.

The question with which we are here immediately concerned is not so much *how* the act shall be construed, but, rather, *by whom* it is to be construed.

The judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of the government, and it is the court's province, as well as its duty, to construe laws enacted by the legislature, 50 Am. Jur. 198, Statutes, § 219.

By Rem. Rev. Stat., § 89 [P. P. C. § 72-1], a jury is defined as

"A body of men temporarily selected from the qualified

inhabitants of a particular district, and invested with power,— . . .

"2. To try a question of fact."

Expressed with relation to each other, the province of the court—the trial judge—is to determine and decide questions of law presented at the trial and to state the law to the jury, while the province of the jury is to determine the facts of the case from the evidence adduced, in accordance with the instructions given by the court. 53 Am. Jur. 141, Trial § 156.

The matter of liberal or narrow construction does not apply to matters of fact, but is limited to questions of law. The court, in its instructions to the jury, is required to give a liberal interpretation of the workmen's compensation act, but the jury is confined to a determination of the facts of the case from the evidence presented, in accordance with the court's instructions as to the law.

By the instruction above quoted, the jury was directed to *apply* the act "liberally" and was cautioned against a narrow construction thereof. In other words, the jury was invested with a power that only the court should exercise. Moreover, the jury was thereby invited, or encouraged, to return the largest verdict possible, rather than a fair and impartial one, according to the evidence in the case. That is not the purpose of the act, for, while its provisions as a legislative enactment are to be liberally construed, the verdicts to be returned thereunder must be fair and impartial in the light of the evidence adduced. The act contemplates a liberal interpretation of its provisions, not a liberal verdict, regardless of the evidence.

The instruction given by the trial court was prejudicially erroneous, and for that reason the judgment is reversed and the cause remanded to that court, with direction to grant a new trial and proceed further in accordance with the views herein expressed.

BEALS, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.