[No. 35779. En Banc. February 14, 1963.]

LOCKWOUL B. WILBER, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.**

*Reported in 378 P. (2d) 684.

*Fredrickson, Maxey & Bell,* for appellant.

*The Attorney General* and *Michael J. Cronin, Assistant,* for respondent.

The appellant, who was the plaintiff in the superior court, appeals from a judgment setting aside a verdict in his favor. He sought a reopening of his industrial insurance claim because his disability increased after the claim was closed. The jury so found, but this verdict was set aside by the trial court and the action dismissed.

Appellant was injured on December 11, 1951, and reported the accident to the industrial insurance division of respondent, which allowed the claim. An award was made from which appellant also appealed, and in which proceeding he obtained an increase in the claim agent's award. The claim was closed on March 7, 1957.

On November 26, 1957, the appellant made application to reopen his case because his condition had become worse, which application the industrial insurance supervisor denied. The appellant then appealed to the board of industrial appeals, before which tribunal he presented his case on June 27, 1958. On January 6, 1959, respondent presented its case in opposition to the same tribunal. On October 26, 1959, the industrial insurance appeal board made its decision affirming the refusal of the supervisor of industrial insurance to reopen the case.

When appellant presented his case to the board of industrial appeals over 4 years ago, he was 57 years of age, 6 feet ½ inch tall, and weighed 180 pounds. He is now 61. At the time of the accident, 11 years ago, he had worked for the same employer, the Sunshine Biscuit Company, for

over 30 years. The undisputed medical evidence of both parties discloses that the fifth intervertebral disc ruptured while appellant was pushing a cart. Nevertheless, he continued working for several days before he consulted Dr. McKinlay of Spokane, who at all times since has been the appellant's only attending physician.

He was subsequently employed by the same company as a night watchman until the company removed its business to California and closed its Spokane plant in 1956. Although other employees were transferred to California, appellant was refused employment; since then he has worked but 3 days and then as a flagman.

The appellant testified that his condition has become progressively worse in the left leg and that he has had periods of total disability, during which time he is in acute distress and even unable to sleep. His education was limited to 2 years in high school. He has no training except for manual labor. He described the acute attacks as follows:

"A. You get up in the morning and the first thing I have an attack and I am no good. I lay down on the floor or wherever I am until I get straightened out again. I don't know if something goes out of place, but that is the way it affects me. Q. Does this come about on frequent occasions, or odd occasions? A. It is more frequent now than it was."

Such attacks have increased in frequency. When the claim was originally closed, all physicians advised surgical repair of the ruptured intervertebral disc. This he declined because of conflicting medical opinion respecting its success. During the period of an acute attack, he is totally disabled. During periods of remission, however, he is able to get about.

Dr. McKinlay testified that the appellant's acute attacks had increased to the point where he was practically immobilized and that the intervals when free of pain were less frequent. Dr. McKinlay testified that, from his experience in similar cases, unless a ruptured intervertebral disc was surgically corrected the disability progresses.

Dr. McKinlay testified that there was more limitation of motion at the time of his last examination, that such was

characteristic of cases of ruptured intervertebral discs, and that, in periods of acute attack, the motion is more restricted than in periods of remission. He had seen him in times of remission and in periods of acute distress. He testified that at the time of his last examination there was muscle spasm. He testified unequivocally that a man with a ruptured disc, unless it was surgically corrected, would become progressively worse, and he advised surgery.

Dr. McKinlay testified unequivocally that appellant was having more pain in November of 1957, when the application to reopen was made, than previously. He made it abundantly clear that persons suffering from a ruptured intervertebral disc have periods of remission and periods of exacerbation, and that appellant had a ruptured intervertebral disc which had never been repaired.

"Q. Well, this condition or situation of pain that you happened to see the man in on November 25, 1957 is sort of a thing that might not be there the next day, if you should examine him again and he was in a period of remission, so to speak; isn't that correct? A. That is correct, yes. The point I thought was important was that according to his own statements these periods of remission were becoming shorter and periods of pain were becoming so frequent he was unable to do any type of gainful employment, which again is characteristic of this type of an injury."

On cross-examination by respondent's counsel, Dr. McKinlay testified:

"Q. Doctor, I see you have a copy of the medical report of Dr. Wallace and Dr. Lambert performed on January 7, 1958? A. Yes, I do. Q. In that the doctors state that whatever aggravation he had in October or November of 1957 had subsided again by January of 1958. Is that a typical situation again in a case like this? A. Yes, it is. It is very typical. He may have had various periods of exacerbation between the time of my examination and their examination. It is very possible."

It was Dr. McKinlay's opinion that the case should be reopened for an operation:

"Q. Did you recommend the surgery again to him in November of 1957? A. Yes, I did. Q. Did he indicate what

his thinking was in that regard? A. It was my understanding that he said he would like to have it done. I didn't write that down on my card, his answer, but I don't think I would have written this recommendation if he had not been willing, because I could see no point in reopening on any other basis."

He expressed the unqualified opinion that, in periods of acute attack, a person suffering from the same affliction would be totally disabled, and that there was no possibility of determining in advance when such acute attacks would occur:

"Q. From your knowledge of medicine and physical injuries of this type, you feel that would substantiate his claim that he has these periods of exacerbation when he gets worse more frequent than he did in 1954 when he was actually working and able to hold down a light job? A. I felt definitely his statement was likely true from my knowledge of other patients of a similar type."

The claims of the appellant were abundantly confirmed and reinforced by the testimony of the department's physicians. On direct examination, by counsel for respondent, its own examining physician testified that appellant's complaints of acute attacks were entirely consistent with the admitted condition of a ruptured intervertebral disc.

Dr. Lambert, called by respondent, testified that the left Achilles reflex was decreased, that this is a significant finding in case of ruptured intervertebral discs, and that his complaints of pain were not of his own fantasy but were substantially objective. He admitted that periods of exacerbation and acute attacks and periods of remission were natural results of ruptured intervertebral discs. He explained acute attacks as follows:

"A. I would say yes to your question because a disc can pop out if a man sneezes, coughs, takes a deep breath, twists in his sleep, and as you mentioned, why, it is going to flare up and flare up and subside. Any little thing will cause it to pop again."

He admitted that he would expect flare-ups from time to time when the appellant would be unable to work. He explained the mechanics of a ruptured disc as follows:

"Q. This condition, that is a condition that exists between two of the bony vertebrae in the back; isn't that correct? A. Yes. Q. Some material protrudes out and presses itself on the nerve causing the results you find, the muscle spasm and trouble in the legs and so on? A. It pinches the nerves, jams against. Q. That is, the nerve itself comes out between the vertebrae and there isn't enough room, I take it, and the disc material protrudes out? There is no place else for it to go? A. Right."

He admitted that appellant would have to find some other employment and that he could not do manual labor. The only occupation that the physician could think of was running an elevator or sorting mail. The department's physicians were unequivocal in their testimony that the appellant's complaints were entirely substantiated because of the ruptured disc. Respondent's other physician witness, Dr. Wallace, testified:

"A. (Reading) 'There is some pain and some tenderness about L-5. He flexes to within 8″ of the floor. Extension and rotation are normal. Tilting is guarded. The straight leg raising test is decreased on the left side. Motion of the hips and knees is normal. The right thigh measures 18″, the left 17½″. The right calf measures 13½″, and the left 12⅞″. There is an obvious decreased sensation on the left thigh and left calf. The left Achilles reflex is decreased. . . .'"

The industrial insurance act, from its inception, has authorized a reopening of a case if an increase in the disability occurred or was discovered after closure. Laws of 1911, chapter 74, § 5(h) (presently codified as RCW 51.32-.160) provided:

"If aggravation, diminution, or termination of disability takes place or be discovered after the rate of compensation shall have been established or compensation terminated in any case the department may, upon the application of the beneficiary or upon its own motion, readjust for future application the rate of compensation in accordance with the rules in this section provided for the same, or in a proper case terminate the payments."

The purpose of this section was explained by the United States Supreme Court in *Gange Lbr. Co. v. Rowley*, 326 U. S. 295, 306, note 15, 90 L. Ed. 85, 66 S. Ct. 125, as follows:

"It was exactly to prevent such rigid finality that the statute preserved both the Department's unlimited power to reopen the case and the employee's power to have it reopened as a matter of right during the limited period. From the beginning the Act seems to have been drawn to avoid the crystallizing effects of the doctrine of *res judicata* in relation to awards, whether as against the employer or the employee. The idea apparently was that the initial award for an injury would afford compensation for harms then apparent and proved. But it was recognized, on the one hand, that all harmful consequences might not have become apparent at that time and, on the other, that harms then shown to exist might later be terminated or minimized. Cf. *Choctaw Portland Cement Co. v. Lamb*, 79 Okla. 109, 110, 189 P. 750. The purpose of the provisions for reopening, whether at the instance of the employer, the employee, or the Department, cf. notes 5 and 14, obviously was to prevent the initial award from finally cutting off power to take account of these later frequent developments. It was to maintain a mobile system, capable of adapting the amount of compensation from time to time in accordance with the facts relating to the injurious consequences for disability as they actually develop, not to cut off rigidly the power either to increase or to decrease the compensation once an award had become 'final' for purposes of appeal."

The difference between objective and subjective symptoms was explained in *Hinds v. Johnson*, 55 Wn. (2d) 325, 347 P. (2d) 828, as follows:

"Objective symptoms, in ordinary cases, are those within the independent knowledge of the doctor, because they are perceptible to persons other than a patient. Subjective symptoms are those perceived only by the senses and feelings of a patient. The doctor must be told of them because he cannot himself perceive them."

■ The statement in the decided cases, that a change in condition may not be predicated upon the testimony of a physician who forms his opinion from subjective symptoms alone, must be taken in connection with the peculiar facts of each case.

"In considering such statements made in the course of judicial reasoning, one must remember that general expressions in every opinion are to be confined to the facts then before the court and are to be limited in their relation

to the case then decided and to the points actually involved. *Cohens v. Virginia*, 19 U. S. 264, 5 L. Ed. 257; *State ex rel. Lemon v. Langlie*, 45 Wn. (2d) 82, 273 P. (2d) 464; *In re Levas' Estate*, 33 Wn. (2d) 530, 206 P. (2d) 482; *Gilmour v. Longmire*, 10 Wn. (2d) 511, 117 P. (2d) 187; *State ex rel. Todd v. Yelle*, 7 Wn. (2d) 443, 110 P. (2d) 162; *Ingham v. Harper & Son*, 71 Wash. 286, 128 Pac. 675." *Peterson v. Hagan*, 56 Wn. (2d) 48, 351 P. (2d) 127.

This requirement, that a claim may not be reopened upon the workman's unsupported claims, is not found in the statute but is one originating solely in the decisions of this court.

■ The Industrial Insurance Act is remedial in nature and the beneficial purpose should be liberally construed in favor of the beneficiaries. *Hastings v. Department of Labor & Industries*, 24 Wn. (2d) 1, 163 P. (2d) 142; *Nelson v. Department of Labor & Industries*, 9 Wn. (2d) 621, 115 P. (2d) 1014; and *Hilding v. Department of Labor & Industries*, 162 Wash. 168, 298 Pac. 321.

■ The cases relied upon by the trial court (*Phillips v. Department of Labor & Industries*, 49 Wn. (2d) 195, 298 P. (2d) 1117; *Moses v. Department of Labor & Industries*, 44 Wn. (2d) 511, 268 P. (2d) 665; and *Kresoya v. Department of Labor & Industries*, 40 Wn. (2d) 40, 240 P. (2d) 257), that an industrial insurance claim might not be reopened for a change in conditions upon the testimony of a physician who based his opinion entirely upon subjective symptoms, mean no more than this: A case may not be reopened if the physician's opinion is based solely upon what the workman related to him. If, on the other hand, the injured workman's complaints can be verified by the symptoms disclosed by the physician's clinical examination, all requirements of proof are met. All of the appellant's complaints were so supported. In fact, the complaints were the classical manifestations uniformly found in cases of unrepaired ruptured intervertebral discs.

That was made very plain by the following passage from *Kresoya v. Department of Labor & Industries, supra:*

" . . . The rule that an expert medical witness may not base his opinion upon subjective symptoms alone is de-

signed to protect the industrial insurance fund against unfounded claims of aggravation. If such claims could be established by the testimony of a physician who based his opinion entirely upon what the claimant told him, it would open the door to fraudulent claims, as well as those mistakenly made in good faith. A claimant might honestly believe his subsequent condition arose out of his original injury, but this is a medical question and an opinion thereon must be derived from sources other than the claimant's statement. *These protective rules, however, must not be applied to situations where there is a combination of subjective and objective symptoms, which an expert may be able to tie together, and we think this is made very clear by a careful reading of the cases we have cited.* The physician must of necessity obtain some history from the claimant, and has a right to make proper use of it in connection with objective findings which he as an expert may make by an examination, the making of tests, the use of X-ray pictures and other proper data." (Italics ours.)

*Smith v. Department of Labor & Industries*, 180 Wash. 84, 38 P. (2d) 1016, is quite similar. There the court stated the applicable rule as follows:

"Before the joint board, respondent contended that his condition had become aggravated, and that he was entitled to an award on the basis of permanent partial disability. Testifying on his own behalf as to his present condition, respondent said that it was difficult for him to stoop, and that

" 'It seems to be a nervous thing, that back will hurt me across there at night when I lay down, maybe I will go to sleep for an hour, and it hurts so bad I have to get up and sit on the edge of the bed.'

"He testified that he was in pain all the time, but that the pain was worse when he stooped or lay down. He complained of lameness in his right leg, and that he suffered from bladder trouble. It clearly appears that, at the time of the hearing, he was suffering from high blood pressure, his own witnesses testifying that this was a factor seriously contributing to his disability.

"Physicians called by respondent, who had examined him shortly before the hearing and had studied X-rays of his spinal and pelvic structure, testified that the X-rays showed evidence of considerable arthritis, around the fourth and fifth vertebrae, and that, in their opinion, the arthritis was traumatic in its origin, because it included only the two

vertebrae. Respondent's medical witnesses testified that a reading of the X-ray plates indicated a fracture of the fifth lumbar vertebra on the right side, as well as a displacement of the fourth and fifth vertebrae. They testified that, because of this condition, respondent was suffering from nerve irritation. One of these witnesses estimated respondent's disability at sixty degrees, testifying that, in his opinion, this condition was the result of the fractured vertebra; it being his theory that the fracture brought about the disability 'through pressure on the nerves, or irritation of the nerves.'

" . . .

" . . . The testimony of one of respondent's physicians, Doctor Banks, however, is, we think, entitled to much weight, and had probative force independently of any technical interpretation of the X-ray pictures. He had been the respondent's physician before and after the accident. Testifying before the joint board, he said:

" ' . . . A. He is less able to engage in occupation. Q. What is the basis of that belief? A. The man needs to go ahead with his work to earn a living, and he is unable to do it. Q. What examination or facts lead you to conclude his physical condition has become worse since March 9, 1932? A. The fact he is unable to go ahead with any work at all at the present time, practically. Q. Was he able to do any work on March 9, 1932? A. He did some light work, but it seems to cause him pain, and he suffers more than he did at that time, apparently. Q. Is your conclusion that his condition is worse merely based on the fact he complains to you the pain is worse? A. No, I wouldn't say that. I think he is less able to do things. Q. What objective findings have you to substantiate the statement that his physical condition is worse than on March 9, 1932? A. I don't know as I can give you specific data in regard to that. Q. In your opinion, Doctor, if there is any increase in pain in the right side and back, is that due to the progress of the disease of arthritis, aggravated by the injury? A. Probably so.'

" . . . A painstaking reading of the record convinces us that the condition caused by his injury did become aggravated, and that, at the trial before the joint board, he sustained the burden of proving this."

The circumstances presented by this appeal are not essentially different than those presented in *Kelly v. Department of Labor & Industries*, 172 Wash. 525, 20 P. (2d) 1105, in which this court concluded as follows:

" . . . There was substantial evidence, however, by lay witnesses other than the respondent that his disability had continuously grown worse down until the date of the trial, June, 1932. The respondent testified to the same effect. Also, a surgeon, upon a personal examination of the respondent in August, 1931, and upon other information, testified that the respondent was suffering from the effects of the slipping of a vertebra near the loins, caused by the 'sudden trauma or sudden jar of his body at the time that he had this cave in,' that is, the accident while working in the ditch. There was evidence to the contrary, but this presented a dispute for the jury to decide."

█ There is not a great deal of controversy respecting the facts. The application to reopen was provoked by a flare-up or acute symptoms which totally incapacitated appellant from any gainful employment. Indeed, the testimony of the physicians employed by the department for the purpose of testifying, was that the history of cases of ruptured intervertebral discs was one of acute exacerbation and remission, and that the symptoms complained of by the appellant were those customarily disclosed in the treatment of cases of unrepaired ruptured intervertebral discs. The department's own physician witnesses testified that there was a lessening of the Achilles reflex in the left foot and that this was a classic symptom of a ruptured disc. It would be impossible to find a case in which the complaints of the injured workman were more completely confirmed by clinical examination than that disclosed by the present record.

The court erred in granting the judgment notwithstanding the verdict, and the judgment n.o.v. is reversed with directions to enter judgment on the verdict.

Appellant will recover costs.

OTT, C. J., FINLEY, ROSELLINI, HUNTER, and HAMILTON, JJ.—The foregoing opinion had been prepared by Judge Harry Ellsworth Foster before his death. A majority of the Court adopt it as their opinion.

WEAVER, J. (dissenting)—One question is presented by this appeal: Is there medical evidence, based on objective

findings, sufficient to support the jury's verdict that claimant's condition became aggravated and his disability increased between certain dates?

My disagreement with the majority opinion is based upon a different understanding of the record before us. My conclusion that the judgment should be affirmed is supported by the well-considered memorandum opinion of the trial judge, which I adopt as my dissent. He said:

"Defendant, in this action, has moved the Court for a judgment N.O.V. on the basis that there were no objective findings upon which the doctors based any conclusions as to an aggravation arising during the period of 1954 through 1957.

"In reviewing the complete trial record it is apparent to the Court that all of the doctors who testified have based any conclusions they might have reached purely on subjective findings.

"Dr. McKinlay, who was plaintiff's own physician, stated in his direct testimony:

" 'I felt it worsened, as I believe I wrote entirely on the basis of his subjective symptoms. I couldn't find any further objective signs, but that of course is typical of this type of case.'

"Further in his testimony, in answer to a question as to whether he found any difference in the atrophy of the plaintiff's arms or legs over the period in question, his answer was, 'No, I didn't.'

"The only other possible objective finding in the testimony would be the evidence of an increase in the aggravation of an arthritic condition in plaintiff's back. This condition was observed by all three doctors from the x-rays but was not attributed in any way to the injury in question.

"Dr. McKinlay, in answer to a statement that all of his objective findings were the same in 1957 as they were in 1954, testified: 'That is what I felt.'

"And further, in answer to the statement there is no significant difference in the objective symptoms, said,

" 'That is correct. I still feel he had a ruptured intervertebral disc that never was repaired.'

"Dr. McKinlay's testimony indicated that he recommended surgery in 1957 and recommended a re-opening of plaintiff's case. In questioning him as to whether he made any note of plaintiff's requesting surgery, he testified:

" 'I didn't write that down on my card, his answer, but I don't think I would have written this recommendation if he had not been willing, because I could see no point in re-opening on any other basis.'

"It is apparent from a close reading of Dr. McKinlay's testimony that he recommended a re-opening of plaintiff's claim for the purpose of performing an operation and not for any aggravation of injury. If there was any aggravation it was not apparent to Dr. McKinlay on the basis of any objective findings.

"This is likewise true of Dr. Lambert, who was one of the examining physicians for the State. He testified, with reference to whether or not the condition of the plaintiff had deteriorated between the dates in question, 'On pure physical findings his condition was about the same,' and again, later, in answer to the statement that his physical findings were substantially the same on both examinations, he answered, 'Yes, sir.'

"Dr. Wallace, who also examined the plaintiff for the State, in answer to a question as to whether or not there was any aggravation of the plaintiff's condition during the period in question, answered:

" 'No. The physical findings were essentially the same. The x-rays revealed nothing abnormal, other than a slight increase of his arthritis, which was compatible with the four-year period that had elapsed.'

"Therefore, applying the rule set out in *Phillips v. Department of Labor & Industries*, 49 Wn. (2d) 195, 298 P. (2d) 1117 (1956), and *Moses v. Department of Labor and Industries*, 44 Wn. (2d) 511, 268 P. (2d) 665 (1954), and *Kresoya v. Department of Labor and Industries*, 40 Wn. (2d) 40, 240 P. (2d) 257 (1952), relating to the necessity of some objective findings as a basis for a medical opinion on aggravation, it is apparent from the testimony in the case that the

verdict of the jury for the plaintiff cannot stand. Defendant's motion for a judgment N.O.V. is, therefore, granted."

I believe that the judgment should be affirmed.

HILL and DONWORTH, JJ., concur with WEAVER, J.