[No. 38404.    Department One.    September 22, 1966.]

WILLIAM C. GROSCHE, *Appellant*, v. WASHINGTON STATE
EMPLOYEES' RETIREMENT BOARD, *Respondent.**

*Reported in 418 P.2d 476.

*Richard A. Perry,* for appellant.

*The Attorney General* and *Philip H. Austin, Assistant,* for respondent.

OTT, J.—September 30, 1963, William C. Grosche was separated from service with the Washington State Highway Department because of physical disability. He filed a claim with the Washington State Employees' Retirement Board in which he contended that his retirement resulted from a duty disability, and requested retirement benefits as provided by RCW 41.40.200. A hearing was had upon the claim. The board found that his retirement resulted from a non-duty disability and awarded him a pension as provided by RCW 41.40.230.

William C. Grosche appealed to the Superior Court for Thurston County, which confirmed the findings and order of the board.

From the trial court's judgment sustaining the board's findings and order, William C. Grosche has appealed.

This appeal presents a single issue: Does the record con-

tain substantial evidence to support the findings of the Washington State Employees' Retirement Board that William C. Grosche's retirement resulted from a nonduty disability?

The facts are not seriously in dispute. William C. Grosche was a maintenance employee of the state highway department. He had performed his highway maintenance duties, stationed at Republic, Washington, for nearly 10 years. His duties in the winter season included operating a snow plow, driving a truck, and assisting in sanding the roads where necessary. Many years prior to his employment with the highway department, he had had rheumatic fever, which illness caused extensive damage to his heart. He could nevertheless perform the normal highway maintenance duties.

December 12, 1961, he was using snow plow equipment to remove snow from the highway between Republic and Keller Ferry. Prior to arriving at the ferry, he changed the blade of the snow plow, which blade weighed between 60 and 100 pounds. He arrived at the hill leading to the ferry, and helped a person who had driven into the ditch get his vehicle back on the highway. He "chained up" his truck and sanded the hill roadway three times, which, because he had no assistant, required that he get in and out of the cab and move the truck along by short distances. When he returned home that evening, he was completely exhausted and could not eat his dinner. He did not report for work the next day, and, on December 18, 1961, was examined by Dr. Dell S. Thornton, who found Mr. Grosche to be suffering from the effects of a mitral valve defect, or possibly heart block or fibrillation, or "perhaps he had caused a small infarction in the partition between the two ventricles."

About one month later, on January 12, 1962, at the request of the highway department, Mr. Grosche was examined by Dr. Theodore J. Fuller, a heart specialist in Wenatchee. Dr. Fuller recommended that when he returned to work he perform only light maintenance duties. Early in February 1962 he returned to work full time. September

20, 1963, Dr. Graham S. McConnell found him to be "a total, complete cardiac cripple."

September 30, 1963, Mr. Grosche was separated from service because of his cardiac condition. Appellant contends that his disability on September 30, 1963, was the natural and proximate result of his exertion more than 21 months before in the performance of his duties on December 12, 1961, and that the record contains no substantial evidence that appellant's separation from his employment was the result of nonduty disability.

The pertinent statutes relating to duty and nonduty disability are as follows:

Subject to the provisions of RCW 41.40.310 and 41.40.320, upon application of a member, or his employer, a member who becomes *totally incapacitated for duty as the natural and proximate result of an accident occurring in the actual performance of duty*, while in the service of an employer, without wilful negligence on his part, shall be retired: *Provided*, The medical adviser after a medical examination of such member made by or under the direction of the said medical adviser shall certify in writing that such member is mentally or physically totally incapacitated for the further performance of his duty to his employer and that such member should be retired: *Provided further*, That the retirement board concurs in the recommendation of the medical adviser: *And provided further*, No application shall be valid or a claim thereunder enforceable unless filed within two years after the date upon which the injury occurred. (Italics ours.) RCW 41.40.200.

Subject to the provisions of RCW 41.40.310 and 41.40.320, upon application of a member, or his employer, a member who has been an employee at least ten years, and who becomes totally and permanently incapacitated for duty as the result of causes occurring not in the performance of his duty, may be retired by the retirement board: *Provided*, The medical adviser, after a medical examination of such member, made by or under the direction of the said medical adviser shall certify in writing that such member is mentally or physically incapacitated for the further performance of duty, and such incapacity is likely to be permanent and that such member should be retired: *Provided further*, That the retire-

ment board concurs in the recommendation of the medical adviser. RCW 41.40.230.

■ One who claims the retirement benefits provided by RCW 41.40.200 must prove to the board, *inter alia*, that, as a "natural and proximate result of an *accident* occurring in the actual performance of duty," he became *totally incapacitated*.

■ We have held that the findings of the retirement board must be sustained if there is substantial evidence to support them. *King Cy. Employees' Ass'n v. State Employees' Retirement Bd.*, 54 Wn.2d 1, 336 P.2d 387 (1959).

Doctors McConnell and Thornton, testifying on behalf of the appellant, admitted that his serious heart condition was not the result of his employment, but stated that, in their opinion, the extra exertion required of him on December 12, 1961, possibly contributed to his disability.

On cross-examination, Dr. McConnell, the only medical witness who had examined Mr. Grosche prior to December 12, 1961, testified as follows:

Q. Actually, isn't it true, Doctor, that the condition you found in Mr. Grosche on the 23rd of September 1963 was something you might very well expect to find in any person who had suffered serious valvular damage as the result of rheumatic fever and over a long period of time had suffered gradual deterioration from recurring bouts of the fever, and the like, isn't this really what you had when you saw Mr. Grosche on the 23rd of September 1963? A. It was a possibility. Q. And it is entirely possible that that situation you found on the 23rd of September 1963 could exist in a person with Mr. Grosche's history without isolated occurrence of extra exertion having occurred at all? A. I don't know the answer to that question. I can give you an opinion, but I don't know. We all age, and we all die. Whether this is what happened or not, I think is up to other observers than I to prove in Mr. Grosche's case. I just don't know. I wasn't aware of all that happened. Q. Well, it would be entirely possible for Mr. Grosche's condition to have been produced simply by the aging process, the deterioration of the areas of his heart that had been damaged by rheumatic fever? A. Possibly. But if, as you say, this is an aging process, how come he is as well as he is today? He is a lot better

today than he was the day I saw him. Q. How do you account for that? A. I think he's got a good doctor.

Dr. Theodore J. Fuller testified on behalf of the respondent. In response to a hypothetical question propounded and accepted by both counsel, which contained all of the material facts, Dr. Fuller testified as follows:

Q. Well, would this activity cause significant damage to his heart? A. In my opinion it would not. . . . I would feel that the unusual exertion had nothing to do with the heart condition, though it could be related to the presence of abnormal rhythm, and the abnormal rhythm could have caused him to have more trouble. Q. Would this have been a more or less permanent change in the activity of the heart? A. That's unpredictable. It doesn't have to be, and again we are postulating since I don't know that that's when it began. . . .

Q. Would such strenuous activity likely have any effect or result in any change in the condition of the mitral passageway and valve? A. I feel that it would have no permanent change. When one goes into heart failure, and this occurrs either gradually or suddenly, it makes no difference, one of the things that the heart does is that it becomes enlarged, or it dilates, because it is unable to empty itself. This, of course, is part of the problem. A failing heart muscle is not able to empty itself with each beat, and residual blood accumulates in the heart, and as a result of this the heart enlarges. This stretches the muscle and it also stretches the tissues of which this valve is composed, and it will increase the amount of insufficiency, for example, that a valve has, and even on occasion a normal valve that was never insufficient will become temporarily insufficient due to the amount of stretching that occurs when a heart dilates when it goes into failure. This, however, is not a permanent change following this type of exertion, in my opinion, but rather is a temporary change that is a direct result of the decompensation, and with adequate medical treatment the heart will return to its previous size, usually in a matter of several days, and no permanent change is made in the size or degree of insufficiency in the mitral valve. Q. Was the condition of the mitral valve, when you saw Mr. Grosche, such that you would attribute it primarily, if not exclusively, to rheumatic fever? A. Yes. Q. Did you see anything that would lead you to believe that

some other factor than rheumatic fever had worked upon the mitral area and had damaged it? A. I had no evidence of that, no. I saw no other disease.

On cross-examination, Dr. Fuller testified, *inter alia*:

Q. And what is your opinion? A. . . . So I will summarize by saying that I would feel that the activity did not mechanically or physically alter the condition of his heart. . . .

Q. Well, Doctor, it wouldn't be unusual in a situation with the state that he was in, with his heart affected by rheumatic fever, to develop fibrillation under a stress like this, would it? A. Well, it would not be unusual for him to develop fibrillation *with or without stress,* because a very great number of these people develop atrial fibrillation and it becomes increasingly difficult to control, and this is part of the natural course of the disease. . . .

Q. Are you prepared to say that this extra exertion did not have any effect on his heart? A. If I could make the stipulation that it was not the cause of the atrial fibrillation, then I would say that the extra exertion, based on the information I had at hand at the time I conducted my examination, did not permanently alter the function of his heart. But I would have to make that stipulation. (Italics ours.)

Following cross-examination, Examiner Baker questioned Dr. Fuller as follows:

Q. I have just one final question. This bothered me in the testimony. It was indicated that one prolonged effort might enlarge the heart and leave it permanently there —enlarged in the atrium, for example—is that true, or would it normally return to where it was, after exertion? A. In my opinion, there is no medical evidence that this is true—that the heart would be permanently enlarged as the result of exertion. . . . Hard physical effort, or unusual lifting or straining, or a sharp physical blow to the chest could result in the rupture of the papillary muscle and create mitral insufficiency. In that case the heart would enlarge dramatically. The patient is usually critically ill and, frankly, most often dies in a matter of days or a week or two unless some open heart surgery or something is done to repair this torn muscle. If we assume that didn't happen, but simply that he had a rheumatic heart that he overtaxed by this unusual exertion, then I would say that no permanent enlarge-

ment would have resulted, and that with rest and medication his heart would have returned to the size that it was previously.

With reference to whether unusual exertion was involved in the work performed by Mr. Grosche on December 12, 1961, Mr. E. D. Rittel, a supervisor for the state highway department, testified:

Q. You say he [Mr. Grosche] did advise you that he had sanded the approach to the Keller Ferry? A. That's right. Q. Did you regard this as being highly unusual or extraordinary for a person to have done? A. No, because most everyone who had found it that way had to do it. Q. Do you recall in the years that you have been in this area occasions where one man would have found himself in the situation of it being necessary to sand that hill? A. I have. Q. By himself? A. That's right.

At the close of the hearing, the retirement board entered the following findings of fact:

I

The claimant, William C. Grosche, is totally and permanently incapacitated for the further performance of duty as the result of a severely damaged heart.

II

The claimant was engaged in strenuous physical activity while on the job with the State Highway Department on December 12, 1961; specifically, the activities involved in his sanding of the approach to the Keller Ferry landing on the Columbia River.

III

This strenuous physical activity brought to the surface certain symptoms of heart damage in the nature of mitral stenosis and insufficiency. However, these physical activities were not the natural and proximate cause of the heart damage.

IV

The heart damage from which the claimant is suffering and which is the cause of his present permanent and total disability is the gradual result of a diseased condition dating back to his early manhood; it was not the natural and proximate result of an accident in the actual performance of his duties on December 12, 1961.

The findings of fact of the retirement board, which was acting as a fact-finding tribunal, are supported by the testimony of Dr. Fuller, who was definite in his statement that the extra exertion on December 12, 1961, was not the cause of Mr. Grosche's physical inability to perform the duties of a highway maintenance man on September 30, 1963. The board's findings are further supported by the testimony of Dr. McConnell, who stated:

> We all age, and we all die. Whether this is what happened or not, I think is up to other observers than I to prove in Mr. Grosche's case. I just don't know. I wasn't aware of all that happened.

Appellant contends that the testimony of Dr. Fuller as to causation is nullified by his answer to one question, in which he assumed that the atrial fibrillation was a pre-existing condition resulting solely from the admitted heart damage caused by rheumatic fever. The precise question was: "Are you prepared to say that this extra exertion did not have *any* effect on his heart?" All of the doctors who testified admitted that exertion causes the heart to beat faster; further, that atrial fibrillation is a common result of rheumatic fever, and that only in cases of *extreme* stress is fibrillation caused by exertion alone. Since there was no evidence of *extreme* stress, Dr. Fuller assumed, under the facts of this case, that the atrial fibrillation was a pre-existing condition. Where, as here, there is no proof that fibrillation resulted from exertion alone, the evidence is insufficient to establish a duty disability.

In *State ex rel. State Employees' Retirement Bd. v. Yelle,* 38 Wn.2d 70, 73, 227 P.2d 745 (1951), we said:

> Under the statute, before a member can be retired, it must be determined that he has become totally incapacitated for duty *as the natural and proximate result of the actual performance of duty,* while in the service of an employer, without willful negligence on his part. It is true that the act does not specifically require the board to make such a finding. However, it is the board's duty, when certain facts exist, to retire a member. Those facts must first be determined by the board before it can take any action.

No such determination was made by the board. In fact, on the record, it could not have been made. All that the board had before it was the fact that the applicant had a pre-existing heart ailment, and that he had carried heavy books up and down stairs. In addition there were statements by Dr. Capaccio and Dr. Green that it is *possible* that the disability complained of is the result of the performance of duty, and the statement of Dr. Jones, the medical adviser, that it is *highly probable* that the disability is the result of performance of duty. On such a record, a trier of facts could do no more than speculate as to what was the natural and proximate result of the actual performance of duty. The board did not have before it sufficient facts to make such a determination.

We conclude that the record sustains the board's finding that the disability which caused Mr. Grosche's retirement on September 30, 1963, was not the natural and proximate result of the performance of his duties on December 12, 1961, but was the result of a nonduty disability, and that the retirement board did not err in determining his disability benefits to be those provided by the legislature in RCW 41.40.230.

The judgment is affirmed.

Rosellini, C. J., Finley and Hale, JJ., and Rummel, J. Pro Tem., concur.