[No. 3270–2. Division Two. June 6, 1979.]

MARGUERITE L. DILLARD, *Appellant,* v. WASHINGTON
PUBLIC EMPLOYEES' RETIREMENT SYSTEM,
*Respondent.*

REED, J., dissents by separate opinion.

*Paul O'Neil,* for appellant.

*Slade Gorton, Attorney General,* and *Wayne L. Williams, Assistant,* for respondent.

PETRIE, J.—Marguerite L. Dillard appeals from a judgment of the Superior Court for Pierce County affirming an

order of the Board of the Washington Public Employees' Retirement System which had denied Mrs. Dillard a duty disability award for which she had applied pursuant to the provisions of RCW 41.40.200. We reverse and remand with instruction to award Mrs. Dillard a duty disability award effective June 1, 1974.

RCW 41.40.200 provides:

Subject to the provisions of RCW 41.40.310 and 41.40-.320 [not herein applicable], upon application of a member, or his employer, a member *who becomes totally incapacitated for duty as the natural and proximate result of an accident occurring in the actual performance of duty,* while in the service of an employer, without wilful negligence on his part, shall be retired: *Provided,* The medical adviser after a medical examination of such member made by or under the direction of the said medical adviser shall certify in writing that such member is mentally or physically totally incapacitated for the further performance of his duty to his employer and that such member should be retired: *Provided further,* That the retirement board concurs in the recommendation of the medical adviser: *And provided further,* No application shall be valid or a claim thereunder enforceable unless filed *within two years after the date upon which the injury occurred.*

(Italics ours.)

All parties to this appeal accept the fact that Mrs. Dillard became totally incapacitated for duty as a result of her work efforts over the last 4 years of her employment at Western State Hospital at Steilacoom, Washington. The board specifically found that

Ms. Dillard became totally incapacitated for duty as a natural and proximate result of the tension and strain placed upon her by her work over a period of years.

 The only issue presented by this appeal, therefore, is whether "the tension and strain placed upon her by her work" constituted an "accident" within the meaning of RCW 41.40.200. Neither the term "accident" nor the term "injury" is defined in RCW 41.40. Both the board and Mrs.

Dillard direct our attention to, and urge upon us, the definition of that term set forth in *Viking Automatic Sprinkler Co. v. Pacific Indem. Co.,* 19 Wn.2d 294, 142 P.2d 394 (1943). We accept their invitations.

In *Viking Automatic Sprinkler Co.,* the court interpreted a liability insurance policy which provided coverage for liability imposed upon the assured for damages "'caused solely and directly as a result of an *accident*'" (italics ours) occurring during the life of the policy. The defendant company denied coverage, despite plaintiff's acknowledged liability for damages, on the theory that "the damage was not caused by an *accident* as contemplated by" the policy. *Viking Automatic Sprinkler Co.,* at 295, 296.

The term "accident" was not defined in the policy and the court accepted two of the definitions then found in *Webster's New International Dictionary* (2d ed. 1957).

(a) "an undesigned, sudden, and unexpected event";
(b) "a mishap resulting in injury to a person or damage to a thing."

*Viking,* at 297.

The record in the case at bench establishes that in 1970 Mrs. Dillard was recruited to work on a ward "M" of Western State Hospital as a ward attendant caring for "patients from all institutions over the State that were violent, suicidal, and self–destructive." The chief psychologist of the hospital, who directed the program, described ward "M" as

the toughest ward in the entire hospital, and the typical duties were cleaning up blood and glass, trying to prevent the patients from hurting each other, and the staff; and it was sort of a part of everyday routine to get beat up, the staff to get beat up, choked out, . . .

Mrs. Dillard testified that within the first half hour of her employment on ward "M", a patient "came up and stomped on my foot right across the instep." She explained that being physically accosted by patients "was a daily thing, almost." On one occasion, a patient in the dining room

tipped over six tables and hurt two other patients and attacked me, and of course the men came and got him right away; this went on for two or three weeks, everytime they would bring him in the dining room; . . .

The director of the program related an incident in which a patient, grappling with Mrs. Dillard, caused both of them to be tossed over a fourth floor parapet. The patient fell to her death to the concrete below, and "Mrs. Dillard was hanging onto the rail when we rescued her." He also described the emotional trauma accompanying events such as, "We had one girl bite the ear off another and eat it" and, "We had one boy put his fist through 256 windows in 72 hours; thirty-eight stitches, he started again."

A clinical psychologist diagnosed Mrs. Dillard's condition as "psycho-physiologic reaction to anxiety," and that her disability in 1974 was caused by "being around violent patients, especially who were unpredictable." He also explained that Mrs. Dillard had a history of physical problems which have a strong neurotic component, and that her employment at Western State Hospital "seriously aggravated the neurotic process."

■ There is no doubt in our minds that each of the events which Mrs. Dillard encountered on a day-to-day basis, singly, constituted an "accident" within the meaning of *Viking Automatic Sprinkler Co.,* and within the meaning of RCW 41.40.200. Furthermore, all of these events, collectively, over a period of 4 years, constituted a series of "accidents" which caused Mrs. Dillard's "total incapacity for duty."

The board insists, however, that Mrs. Dillard did not sustain an "accident" because all of these events, though they admittedly produced stresses and strains which caused her disability, and which would ordinarily be considered abnormal and unusual, "were routine in the twisted world of the mental hospital."

Armed with this "normal routine duties of a job" argument, the board directs our attention to a long series of so-called "heart attack" cases in this and other jurisdictions

which deny claims for "injury" or "accident" under workmen's compensation or retirement statutes on the theory that a routine act not involving unusual exertion on the part of an employee does not constitute an injury.

Mrs. Dillard is not suffering from a malfunction of her heart; hence, those cases are inapposite. In *Boeing Co. v. Fine*, 65 Wn.2d 169, 171, 396 P.2d 145 (1964), the court expressly declared that "under currently persuasive medical theory" an "unusual exertion" was necessary to satisfy the definition of injury to the heart. However, the court refused to extend this "unusual exertion" requirement to establish an injury to other parts of the body.

■ We conclude that the board applied an erroneous standard of law with which to measure the term "accident" as contemplated by RCW 41.40.200. Thus, the board committed an error of law. Applying the appropriate standard of law from *Viking Automatic Sprinkler Co.* to the facts at bench, we conclude that Mrs. Dillard's total incapacity was caused by an accident.

Judgment reversed with direction to award Mrs. Dillard a duty disability award effective June 1, 1974, less the cumulative amount of awards previously paid.

PEARSON, C.J., concurs.

REED, J. (dissenting)—I must respectfully dissent. I believe the majority misstates the real issue in this case. I believe the issue is: Was the board's determination that Mrs. Dillard's total incapacity arose from "the tension and strain placed upon her by her work over a period of years" and not as the natural and proximate result of an accident, "clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order"? RCW 34.04.130(6)(e).[1]

---

[1]RCW 41.40.420 as amended by the Laws of 1969, ch. 128, § 16, provides that judicial review of board decisions and orders shall be governed by the provisions of RCW 34.04 *et seq.*, the administrative procedures act. Before amendment, this section provided for appeals to the superior court of Thurston County; appeals

Bearing in mind that RCW 41.40.200 requires a disabled employee to prove that his incapacity is "the natural and proximate result of an accident occurring in the actual performance of duty," a recapitulation of the facts before the board will aid in bringing the issue into sharper focus. Mrs. Dillard commenced work as a hospital attendant (HA) at Western State Hospital in 1959 and had achieved a rating of HA III by 1969, when she was demoted to HA I and assigned to ward M. Unfortunately, Mrs. Dillard had not enjoyed good health for a number of years. In fact, her medical history is as follows:

1939, appendectomy
1943, kidney and bladder repair
1943, hospitalized for psychoneurosis
1949, kidney surgery
1951, typhoid, colitis, and ileitis
1954, hysterectomy
1957, onset of trigominal neuralgia (tic douloureux)
1968, ileocolostomy

According to Dr. Morain, her attending physician, the 1968 surgery was occasioned by her complaints of diarrhea, regional flatus, partial bowel obstruction, inflamed ilium— with evidence of perforation—necrosis, and fat neurosis. Following surgery and to the present time, she continues to be plagued by diarrhea, abdominal pains and flatus, and by a marked and debilitating increase in bowel movement (20 per day).

On May 7, 1974, Mrs. Dillard applied for so-called non-duty related disability retirement. RCW 41.40.230. On her application form she stated her condition was *not* the result of an accident. On the employer's portion of the form her nursing supervisor stated Mrs. Dillard could not perform her duties because she was "physically unable to lift and

---

were restricted to such issues of law as were raised before the board. Under the previous statute, the Supreme Court held that findings of the Retirement Board that a claimant's disability was not proximately caused by an accident must be sustained if supported by substantial evidence. *Grosche v. State Employees' Retirement Bd.*, 69 Wn.2d 337, 418 P.2d 476 (1966).

perform normal nursing duties"; she attributed Mrs. Dillard's problems to "failing health over a period of last year which appears to be getting worse." On the same form, Mrs. Dillard's personal physician stated her disability was *not* the result of accident. Dr. James Roe, the board's medical adviser, certified that Mrs. Dillard's disability was nonduty related; his diagnosis was "terminal ileitis with apparently some colitis of the proximal colon."

Based on the foregoing, on May 20, 1974, the board granted Mrs. Dillard's request for "nonduty disability retirement." RCW 41.40.230. In April 1975 she retained an attorney, who requested that her claim be reconsidered as a duty-related (accidental) disability. RCW 41.40.200. The Board granted a hearing on June 10, 1975. In these proceedings, Dr. Arville Davis, chief psychologist at Western State Hospital, testified to the general conditions on ward M; these included the bizarre incidents referred to by the majority; he did not say Mrs. Dillard was personally involved, either as participant or spectator, in many of these incidents. Nor did Dr. Davis connect *any* of these incidents, including the patient's fall from the parapet, with any specific traumatic injury—physical or mental—to Mrs. Dillard. Letters from three fellow nurses all failed to isolate or trace Mrs. Dillard's difficulties to any specific traumatic event; rather, all three nurses attributed Mrs. Dillard's problems to her "working conditions." Finally, Pritam Rohila, Ph.D., a clinical psychologist with previous employment at Western State Hospital, testified as follows:

Q And, were you able to form in your opinion, as a psychologist, a clinical psychologist, an opinion as to what her condition was?

A Yes. I believe, and according to the information that was available to me, from the tests and case history that she was experiencing—well, the diagnosis would be psychophysiologic reaction to anxiety.

Q Were you able to form an opinion as to whether this condition was disabling from her duties at Western State Hospital?

A Yes, it was disabling in the sense that partly because of the physical problems she had in connection with the stress factor; *she became extremely apprehensive;* she would have to go to the bathroom very frequently and she was unable to sleep unless she had some medication to take; *she became depressed* and all these things led to her not being able to continue to function under that setting.

Q Now, were you able then, to form an opinion as to whether or not there was a relationship between the factors at work and her disability status?

A Yes. There was definitely a relationship although as I mentioned, she has had a background of problems before. She has, like for example, she has a stuttering problem from childhood. She has had some nervous problems from childhood and she stutters even now when she's upset.

She was at Oregon State Hospital one time in 1943; she was not psychotic according to the report that I have seen, but she, the diagnosis was psycho–neurosis. So, she has had a background of emotional problems and a series of physical problems she has had, kidney problems, bladder problems, and she has, she is suffering from neuralgia of the left face; because of that she is under constant pain. So, *all of these factors interacting with the stress at work* contributed to the disability.

Q So, as I understand what you're saying, then, these factors would be more in the nature of aggravating her pre–existing underlying condition, rather than causing a separate condition?

A That's right.

Q You heard the conditions that Doctor Davis described. Can you comment as to whether or not these were consistent with the history you took, or do you want to elaborate on your history?

A They are consistent with the information that I have, and with the kinds of problems Mrs. Dillard has had.

Q So, did you form an opinion as to what actually caused her disability in June of 1974?

A I believe that it was *being around violent patients,* especially who were unpredictable; they could hurt her at any time; they were all around her, and it was not possible to defend herself against everybody, and

that actually aggravated her pre–existing condition. Did I answer your question?

(Italics mine.) The board also had before it Dr. Rohila's written report which summarized Mrs. Dillard's condition as follows:

Because of several medical problems [those described above] she had become very sensitive to physical and emotional stress. Being around violent patients considerably added to the stress. She became very fearful and apprehensive. Not able to take it anymore, she finally left her employment on disability retirement in June, 1974, at age 57.

Intellectually, Mrs. Dillard is functioning better than most adults her age. Her physical problems have a strong neurotic component. In my opinion, *emotional stress at work* during her employment at Western State Hospital seriously aggravated the neurotic process resulting in physical problems and psychological distress that led to premature termination of her career.

(Italics mine.)

Based upon this evidence, the board made the following findings of fact:

7. In view of the testimony adduced at the hearing held June 10, 1975, the Board finds that Ms. Dillard became totally incapacitated for duty as a natural and proximate result of the tension and strain placed upon her by her work over a period of years. These conditions existed while she was in the service of an employer and occurred without willful negligence on her part.

. . .

9. There is no evidence which established that the applicant's present medical condition is the result of an "accident" occurring in the performance of duty.

10. The evidence establishes that the extraordinary strain and tension placed upon the applicant affected her physical condition and resulted in her disabled condition. The evidence establishes that this deterioration was gradual, occurred over a period of years and cannot be attributed to any single, traumatic event.

Granting that the parapet incident, the foot–stomping episode of 1969, and being a witness—*if she was*—to certain other bizarre patient activities were "accidents" as that

term is used in RCW 41.40.200, I fail to see how this court can say the board erred when it found these "accidents" did not naturally and proximately cause her disability. Certainly there is ample evidence that, without these isolated incidents, whose immediate physical and psychological effect upon her we do not know, Mrs. Dillard had serious organic and functional problems of a disabling nature.

Neither medical doctor found any accidental cause for Mrs. Dillard's disability; in their opinion her problems were caused by the gradual organic deterioration. I have found no decision which requires that the causal relationship between injury (accident) and disability be established by competent medical opinion under RCW 41.40.200. Such has long been the rule in workmen's compensation cases; however, *see Floyd v. Department of Labor & Indus.,* 68 Wn.2d 938, 416 P.2d 355 (1966); *Stampas v. Department of Labor & Indus.,* 38 Wn.2d 48, 227 P.2d 739 (1951). I submit the rule is the same in public employee retirement cases; if so, Mrs. Dillard failed utterly to provide competent medical evidence of a causal relationship between her "accidents" and her total incapacity to further perform her duties.

Nor do we know the value, if any, the Board gave to Dr. Rohila's testimony. Assuming arguendo that Dr. Rohila's nonmedical testimony is both competent to establish and did in fact establish a causal connection between some traumatic incidents and Mrs. Dillard's disability—I submit it did not—the Board had the right to reject his opinion *in toto. Cf. Brewer v. Copeland,* 86 Wn.2d 58, 542 P.2d 445 (1975).

In the last analysis, Mrs. Dillard may have established entitlement to a duty–related retirement under RCW 41.40.200 as it read before amendment in 1951.[2] However, as recognized in *Clark v. Retirement Bd.,* 43 Wn.2d 90, 260

[2]As enacted by the Laws of 1947, ch. 274, § 21, p. 1182, RCW 41.40.200 read in part as follows: "a member who becomes totally incapacitated for duty *as the natural and proximate result of the actual performance of duty,* while in the service of the state of Washington, without wilful negligence on his part, shall be retired . . ." (Italics mine.)

P.2d 348 (1953), the legislature must have intended by its amendment to restrict duty–related disabilities to those arising from a specific and traceable accident or accidents. Even though Mrs. Dillard's claim would probably qualify as an occupational disease under a statute such as RCW 51.08.140, the legislature has not seen fit to grant duty disability retirement benefits to public employees suffering from occupational disease. Of course, one disabled by such a disease may retire under RCW 41.40.230.

Unlike workmen's compensation, *Wilber v. Department of Labor & Indus.*, 61 Wn.2d 439, 378 P.2d 684 (1963), no statute or judicial precedent of this state requires that the Public Employees Retirement Act be given a liberal construction in favor of the employee. I submit this omission stems from a recognition of the difference in philosophies underlying the two types of legislation. *See Croshier v. Levitt*, 5 N.Y.2d 259, 157 N.E.2d 486, 184 N.Y.S.2d 321 (1959) and *Hough v. Contributory Retirement Appeal Bd.*, 309 Mass. 534, 36 N.E.2d 415 (1941).

I submit the board neither disregarded nor misinterpreted the "accidents" reflected by the record. Nor do I believe the board was simply refusing to recognize or apply the so–called "repeated trauma" doctrine which the majority appears to employ to reach its result, *see Lehtinen v. Weyerhaeuser Co.*, 63 Wn.2d 456, 387 P.2d 760 (1963), *but see also Cooper v. Department of Labor & Indus.*, 49 Wn.2d 826, 307 P.2d 272 (1957).

In the instant case there was no convincing proof that Mrs. Dillard's disability arose from "repeated trauma"; it appears more likely to have resulted from the cumulative effect of long–continued routine and customary duties. *Cf. Cooper v. Department of Labor & Indus., supra.* In other words, as Dr. Rohila put it, she could no longer tolerate "being around violent patients." Other courts have refused to find an "accident" in these circumstances. *See, e.g., Sawyer v. Pacific Indem. Co.*, 141 Ga. App. 298, 233 S.E.2d 227 (1977) (nervous breakdown of counselor after long exposure to group of disturbed inmates held a "disease

process" and not result of accident); *Jolly v. Kansas Pub. Employees Retirement Sys.,* 214 Kan. 200, 519 P.2d 1391 (1974) (corrections officer collapsed and died minutes after violent confrontation with inmate who threw sweatshirt in officer's face); *Hough v. Contributory Retirement Appeal Bd., supra* (town clerk suffered paralysis after particularly stressful town meeting). *See generally* Annot., *Government Employee—Pension—Benefits,* 85 A.L.R.2d 1048 (1962).

In conclusion, I fail to see how this court, in the face of the record before the board, can be left with a "definite and firm conviction that a mistake has been committed." *Ancheta v. Daly,* 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969). I believe the majority fails to give proper deference to the authority and expertise of the board, which has been entrusted by the legislature with administration in the narrow field of public employees' retirement. In failing to do so, the court substitutes its judgment for that of the board. This it cannot do, *cf. Ancheta v. Daly, supra.* Even if the majority is correct in treating the issue as one properly reviewable as an "error of law" under the administrative procedures act, this court should still defer to the board's expertise in its special law field. The board's application of the statutory term "accident" to the undisputed facts before it should not be disturbed unless it is found to be unreasonable in view of the purposes of the public employees retirement act.[3]

Reconsideration denied August 13, 1979.

Appealed to Supreme Court September 11, 1979.

---

[3]For a scholarly discussion of the problems engendered by the review standards encompassed by section 6 of Washington's administrative procedures act, RCW 34.04.130(6) and a critique of recent Washington decisions employing the standards, *see* Harlan S. Abrahams, *Scope of Review of Administrative Action in Washington: A Proposal,* 14 Gonz. L. Rev. 75 (1978).